**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| RICARDO GARCIA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-902 |
| | § | |
| MAC EQUIPMENT, INC., *et al*., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Ricardo Garcia sued his former employer, MAC Equipment, Inc., and two employees: the assistant plant manager at MAC's Houston plant, Lazaro Rafael Espinoza, and the fabrication and welding supervisor at the same facility, Arturo Solis. Garcia worked as the plant manager at MAC's Houston plant. He alleges that he was retaliated against, including by job termination, after he complained about sexual harassment in the workplace. Garcia asserts claims for retaliation, in violation of Title VII, 42 U.S.C. § 2000e-3(a), and the Texas Commission on Human Rights Act (TCHRA), Tex. Lab. Code § 21.055, and under Texas common law for intentional infliction of emotional distress, defamation, and tortious interference with contract. After discovery, the defendants moved for summary judgment on all of Garcia's claims.[1] Based on a careful review of the pleadings; the motion, responses, and replies; the record; and the applicable law, this court grants the defendants' motion for summary judgment as to the claims for intentional infliction of emotional distress and tortious interference with contract, and denies the motion as to the Title VII, TCHRA,

---

[1] The defendants' motion for summary judgment is filed at Docket Entry No. 25. Garcia responded, (Docket Entry No. 28), and the defendants replied, (Docket Entry No. 30). Garcia surreplied, (Docket Entry No. 36), and the defendants responded, (Docket Entry No. 37).

and defamation claims.[2]  A status conference is set for **September 22, 2011, at 3:30 p.m.** to set a

schedule to resolve the remaining claims.

The reasons for these rulings are explained in detail below.

## I.     Factual Background[3]

MAC, based in Kansas City, Missouri, is one of the largest pneumatic conveying and

filtration equipment suppliers in North America.  MAC has four plants in the United States,

including one in Houston.  Gary Cavey was MAC's president and chief executive officer during the

time Garcia worked for the company.  Kathy Poehler was MAC's director of human resources

during the same period.  Both Cavey and Poehler worked at MAC's corporate headquarters in

Kansas City.

MAC's plant managers reported directly to Cavey.  In the months leading up to Garcia's

employment at MAC, Cavey fired two plant managers at MAC's Houston plant.  Colin Mattox was

fired for poor performance; his successor, Bob Preissinger, was fired for the same reason after

holding the position for less than six months.  (Docket Entry No. 25, Ex. 31, Cavey Depo., at 7-9).

Cavey also fired a plant manager at MAC's Sabetha, Kansas plant, again citing poor performance.

---

[2]  Garcia objects to various exhibits attached to the defendants' motion for summary judgment.  Because this court denies
summary judgment as to the retaliation and defamation claims and because the evidence Garcia objects to does not affect
the grant of summary judgment as to the intentional infliction of emotional distress and tortious interference claims, the
defendants' objections are denied without prejudice as moot.  Garcia may renew his evidentiary objections at a later stage
in the litigation if appropriate.  The defendants have moved to strike the third paragraph of Garcia's affidavit, which
Garcia has attached as Exhibit A to his response to the defendants' motion for summary judgment.  Because this
paragraph has no bearing on the resolution of the defendants' motion for summary judgment, the defendants' motion
to strike is also moot.

[3]  Both parties attached extensive summary judgment evidence but only cited limited parts of the evidence in their
motions and briefs.  Federal Rule of Civil Procedure 56 does not obligate a court to search the record for uncited
evidence supporting a party's motion for, or opposition to, summary judgment.  *See Pita Santos v. Evergreen Alliance
Golf Ltd.*, 650 F. Supp. 2d 604, 611 n.1 (S.D. Tex. 2009).

Cavey hired Garcia as the manager of MAC's Houston plant in July 2007.  Garcia began working in August 2007.  (Docket Entry No. 25, Ex. 1, Poehler Aff., ¶ 4; Docket Entry No. 25, Ex. 2).  Around the same time, Cavey hired Espinoza to be the assistant plant manager.  Cavey wanted the two men to work together to improve the Houston plant's profitability.  (Docket Entry No. 25, Ex. 31, Cavey Depo., at 34).  Garcia protested Cavey's decision to hire Espinoza on the basis that he did not need an assistant plant manager.  (*Id.*, at 35).

On October 8, 2007, an employee at MAC's Houston plant, Francisco Luis, sent an email to MAC's management in Kansas City.  Luis complained about Garcia's aggressive management style and Garcia's demand that employees in the assembly department work uncompensated overtime hours.  (Docket Entry No. 25, Ex. 6).  Approximately two months later, on December 11, 2007, Poehler received notice that Garcia had fired Luis's son, Carlos, for poor performance and insubordination.   (Docket Entry No. 25, Ex. 10).   Poehler emailed Garcia and stressed the importance of following MAC policies on hiring and firing.  (*Id.*).  Poehler expressed concern that MAC might be exposed to liability if Garcia failed to do so.  (*Id.*).  Garcia responded that he had given Carlos Luis "too many opportunities" before firing him.  (*Id.*).  Garcia also stated that he had notified Poehler about his intent to fire Carlos Luis weeks earlier, by copying her in an email exchange in which he issued an ultimatum to Luis.  (*Id.*).  Poehler complained to Cavey about Garcia's failure to follow MAC's policies and procedures.  (Docket Entry No. 25, Ex. 11).

In October 2007, Poehler sent Garcia documents detailing MAC's official hiring and termination processes.  (Docket Entry No. 25, Ex. 5).  These processes required that MAC's human resources department approve all potential employees before any offer of employment was extended.  (*Id.*).  The policies also required that the director of human resources review any involuntary

3

termination decision before it was acted on.  (*Id.*).  In his deposition, Garcia testified that he understood the policies.  (Docket Entry No. 25, Ex. 33, Garcia Depo., at 43, 46–52).

On November 1, 2007, Poehler sent an email to Garcia and Espinoza stressing that the managers at the Houston plant needed to follow MAC's hiring and firing procedures.  (Docket Entry No. 25, Ex. 8).  On December 5, 2007, Poehler sent an email to Cavey explaining that the human resources department was having "a difficult time" working with Garcia.  (Docket Entry No. 25, Ex. 9).  On December 14, 2007, Poehler notified Garcia and Cavey that Garcia had again failed to comply with MAC procedures on hiring and firing employees.  Garcia had hired a welder at the Houston plant but had not sent the necessary paperwork to human resources until after the employee had already begun working.  (Docket Entry No. 25, Ex. 12).  Garcia had also fired three employees in January 2008 without following MAC's procedures.  Another email exchange between Poehler and Garcia followed, in which Garcia reported difficulties in getting timely responses from the human resources department, and Poehler responded by giving Garcia her cellular telephone number.  (Docket Entry No. 25, Ex. 13).

MAC's records show that the problems continued.  Of fifteen employment terminations at the Houston plant between February 1, 2008 and May 9, 2008, thirteen terminations lacked proper documentation.  (Docket Entry No. 25, Ex. 14).

Around 1:00 p.m. on Monday, May 5, 2008, Garcia called Cavey and Poehler at MAC's Kansas City office.  The previous night, Mery Rincon, a receptionist at the Houston plant, phoned Garcia and, according to Garcia, reported to him that Espinoza had said that Garcia was "[another employee's] bitch."  (Docket Entry No. 25, Ex. 16).  Garcia also complained that Espinoza had made comments to other employees about Garcia having a "weird sexual orientation."  (*Id.*).  Garcia told

Cavey and Poehler that "Mexicans are homophobic" and that such "accusations" were the "[e]asiest way to trash [Garcia's] reputation."  (*Id.*).  The phone call broke for a staff meeting shortly before 1:30 p.m.  (*Id.*).

After the phone call ended, Rincon sent an email to Poehler with a copy of a document dated April 7, 2008.  Garcia asserts that the document was a written warning he had issued to Espinoza after a disagreement between the two men during which Espinoza had challenged Garcia to a physical fight. (Docket Entry No. 25, Ex. 17).  Garcia termed the warning "an agreement"; the document purports to give Espinoza notice that another incident would be grounds for immediate termination.  (*Id.*).  The document has a line for Espinoza to sign to acknowledge the warning, but according to Garcia, Espinoza refused to do so.  (*Id.*; Docket Entry No. 25, Ex. 33, Garcia Depo., at 81).  The document bears the signature of Arturo Solis as a witness.  When questioned about the document at his deposition, Solis testified that he did not understand it because it was written in English. (Docket Entry No. 25, Ex. 32, Solis Depo., at 28).  Solis stated that he signed the document because Garcia told him to.  (*Id.*).  According to Poehler's notes, Espinoza told her that Garcia "tried to give him a write-up," but Espinoza "rejected it."  (Docket Entry No. 25, Ex. 22, at 6).  Garcia then "crumpled up the pages" and "threw them away."  (*Id.*).  Espinoza never read the document.  (*Id.*).

At 2:45 p.m. on May 5, the phone conversation among Garcia, Cavey, and Poehler resumed. (Docket Entry No. 25, Ex. 18).  Garcia complained that Espinoza had told other employees that Garcia was homosexual and that he had hugged everyone when he visited MAC's plant in Sabetha, Kansas.  (*Id.*; Docket Entry No. 28, Ex. B, Garcia Depo., at 99–100).  Garcia also said that during his phone call with Rincon the previous night, she reported that Espinoza had touched her inappropriately three times.  Garcia stated that Rincon had written down the dates of these occasions

5

and was "very upset."  (Docket Entry No. 25, Ex. 18).  Garcia stated that Rincon also told him that Espinoza had touched another female employee, Lupe Montoya, inappropriately.  (*Id.*).  Poehler questioned Garcia about Rincon's complaints and made plans to call Rincon that afternoon.  Cavey told Garcia that representatives from MAC's human resources department would travel to Houston that week to investigate.  (*Id.*).  Garcia told Cavey and Poehler that he had a "bad hunch" about Espinoza from the beginning.  Cavey instructed Garcia that he was to take no action towards Espinoza and should conduct business as usual.  (*Id.*).

Later that afternoon, Poehler phoned Rincon.  (Docket Entry No. 25, Ex. 18).  Poehler told Rincon that she would travel to Houston at the end of the week to investigate the situation.  (*Id.*).  Rincon said that she was comfortable continuing to work while Poehler investigated.  (*Id.*).  Rincon stated that she was documenting details of Espinoza's inappropriate conduct.  (*Id.*).  Before the call ended, Poehler gave Rincon her cell phone number and told Rincon that she should call with any additional concerns.  (*Id.*).  After the call, Poehler emailed Garcia.  (Docket Entry No. 25, Ex. 19).  She summarized her phone call with Rincon and said that she would be in Houston at the end of the week.  (*Id.*).

Two days later, Rincon sent Poehler two letters. In the first letter, Rincon described Espinoza's "gossip and jokes" about Garcia being homosexual.  (Docket Entry No. 25, Ex. 20).  Rincon first heard this in March 2008, when Espinoza and Montoya walked into the Houston plant reception area telling jokes and "mocking" Garcia about being homosexual.  (*Id.*).  In the following weeks, Rincon saw Espinoza, Solis, and others joking about Garcia being homosexual.  (*Id.*).  Espinoza often referred to Garcia as "la vieja."  (*Id.*).  Rincon testified that Espinoza used "la vieja"—"old lady"—to insinuate that Garcia was homosexual.  (Docket Entry No. 28, Ex. C, Rincon

6

Depo., at 259).   According to Rincon, Espinoza also referred to Garcia as "she" on several occasions.  (Docket Entry No. 25, Ex. 20).   Rincon stated that Espinoza showed her a video featuring two homosexual men and told her that one was "playing [Garcia's] character."   (*Id.*). While Rincon sometimes laughed at the jokes, she stated in her letter that she felt "horrible" and reported Espinoza's conduct because the gossip was "completely out of hand."  (*Id.*).

In her second letter to Poehler, Rincon described "unwelcomed physical contact and inappropriate comments from [her] supervisor[,] . . . Espinoza."  (Docket Entry No. 25, Ex. 21). Rincon stated that the first inappropriate contact occurred in January 2008, when Espinoza caressed her arm.  (*Id.*).  Rincon told Lupe Montoya, another employee in the Houston plant's front office, of the unwanted contact, but took no further action.[4]  (*Id.*).  On April 18, Rincon was working alone in the office when Espinoza caressed her arm again and called her "very attractive."  (*Id.*).  Rincon did not tell anyone at MAC of that incident.  On April 22, Espinoza caressed her arm a third time. When Rincon protested because she had medicine on her arm, Espinoza responded by saying "ok, then a little higher" and caressed her shoulder.  (*Id.*).

Poehler interviewed Rincon in Houston on May 8, 2008.  (Docket Entry No. 25, Ex. 22). In the interview, Rincon detailed the three episodes of inappropriate behavior she had described in her letter.  (*Id.*, at 1–2).  Rincon also told Poehler of additional suggestive comments Espinoza had made.  (*Id.*).  Rincon gave examples of Espinoza's comments, including one in which he asked Rincon when she was going to wear "Brazilian jeans."  (*Id.*, at 2).  Rincon also reported that Espinoza stood too close to her when giving instructions and generally made her feel uncomfortable.

---

[4]   Poehler testified that Montoya was a "coworker" and did not have a supervisory role. (Docket Entry 25, Ex. 30, Poehler Depo., at 42). This is inconsistent with Rincon's assertions that she viewed Montoya as her supervisor and received most of her assignments from Montoya and Espinoza.  (Docket Entry No. 25, Ex. 21; *id.*, Ex. 22).

(*Id.*).  Rincon told Poehler that Montoya overheard some of Espinoza's comments and observed some of his behavior.  Rincon also told Poehler that Espinoza gave Garcia the nickname "la vieja" to insinuate that he was homosexual.  (*Id.*).  Rincon told Poehler that she wanted Espinoza to quit acting inappropriately and instead behave more professionally.  (*Id.*, at 3).

Poehler also interviewed Montoya and Espinoza.  According to Poehler's notes, Montoya recalled one incident in which Espinoza had made Rincon feel uncomfortable, but Montoya was unable to recall many of the incidents Rincon had described.  (*Id.*, at 4).  Montoya recalled that Espinoza had told "jokes" suggesting that Garcia and Solis were "significant others."  (*Id.*).  She also recalled Espinoza stating that Garcia was Solis's "lady," which could be interpreted as a comment "about being gay."  (*Id.*).

Poehler's interview with Espinoza lasted more than two hours.  (*Id.*, at 5).  Poehler's notes indicate that Espinoza explained that he made the "la vieja" comments to suggest that Garcia nagged Solis like "a wife nags a husband."  (*Id.*).  Espinoza claimed that the comments were never used in a sexual context.  (*Id.*).  Espinoza recalled showing Montoya a video of a "gay couple kissing" and asking Montoya whether "they should show [Rincon] the video."  (*Id.*).  Espinoza explained  that he "[m]ust not have been thinking" and did not recall "comparing [Garcia] to one of the video characters."  (*Id.*).  Espinoza also denied touching, stroking, or caressing Rincon and denied making many of the comments Rincon had described.  (*Id.*, at 5–6).

Poehler's investigation continued on May 9, 2008.  She did an initial interview of Joel Templeton, another Houston plant employee.  Penny Craig, another MAC employee, did follow-up interviews with Montoya and Rincon.  (*Id.*, at 7–9).  At around 10:00 a.m., Poehler saw Espinoza in the parking lot carrying some books to his vehicle and asked him what he was doing.  (*Id.*).

8

Espinoza responded that Garcia had told him to clean out his office during a phone call that morning.  (*Id.*, at 10).  On further inquiry, Poehler learned that Espinoza believed that Garcia's statement meant that Garcia was planning to fire Espinoza the following Monday, when Garcia was scheduled to return to the plant.  (*Id.*).  Approximately thirty minutes after that conversation, Poehler formally interviewed Espinoza.  (*Id.*).  Espinoza stated that Garcia told him to clean up his desk.  (*Id.*).  Poehler's notes show that Espinoza told her that he was not sure what Garcia had said because "[Garcia] talks on edge."  (*Id.*).  Espinoza acknowledged that Garcia also instructed Lupe Montoya to clean up her desk.  (*Id.*).  At his deposition, Garcia testified that he told Espinoza and Montoya to clean their offices because they were messy and MAC's new owners from Scotland were visiting the Houston plant the following week.  (Docket Entry No. 28, Ex. B, Garcia Depo., at 101–02).

Later that morning, Craig did a follow-up interview with Espinoza.  (Docket Entry No. 25, Ex. 22, at 11).  Craig's notes show that Espinoza denied referring to Garcia as "she."  (*Id.*).  Espinoza admitted that he sometimes complimented Rincon on her appearance, but he explained that such comments were common in Latin American culture.  (*Id.*).  Espinoza claimed that he had showed Montoya the video featuring two homosexual men to show her that "there are a lot of different things in America."  (*Id.*).  Craig's notes also reflect that Espinoza stated his jokes were to make fun of "what is happening to [Solis]," not Garcia.  (*Id.*).  Espinoza explained that Solis felt threatened by Garcia and was uncertain if Garcia was "that way."  (*Id.*).  Espinoza also pointed to incidents that he felt showed that Rincon was comfortable working with him.  (*Id.*).

Later on May 9, while the investigation was still in progress, Poehler called Garcia.  (*Id.*, at 12).  Poehler told Garcia that Cavey had decided to terminate Garcia's employment with MAC, effective immediately.  Poehler told Garcia that he should not return to the Houston plant and should

9

not contact any employees, suppliers, or customers.  Poehler's notes indicate that Garcia responded that he understood and wanted to seek legal assistance.  (*Id.*).  At his deposition, Garcia testified that Poehler refused to tell him why he was being fired.  (Docket Entry No. 25, Ex. 33, Garcia Depo., at 90).

After Garcia was fired, Poehler completed her investigation and summarized her findings in two letters.  (Docket Entry No. 28, Ex. F, Poehler Depo., at 63).  One of the letters was to Rincon. Poehler commended her for doing "the right thing" by raising her concerns and stated that Espinoza regretted any actions that had made Rincon feel uncomfortable.  (Docket Entry No. 25, Ex. 24). Poehler also referred to steps taken to prevent such conduct in the future.  (*Id.*).  In the second letter, to Espinoza, Poehler "reiterated . . . that all employees are to treat others with dignity and respect and that personal comments, spreading rumors and touching another on the arm are inappropriate in the workplace and are to be avoided."  (Docket Entry No. 25, Ex. 25).  Poehler asked Espinoza "to re-review" MAC's policies on harassment, code of business conduct, and information security, and included copies.  (*Id.*).  Poehler did not believe further action was necessary.  (*Id.*).

MAC and its employees have offered varied accounts of the decision to fire Garcia.  In their motion for summary judgment, the defendants argue that Garcia was fired because of Poehler's belief that he was about to fire both Espinoza and Montoya.  Poehler wrote a letter to Garcia stating that he was fired "based upon loss of confidence in your ability to further serve as Plant Manager." (Docket Entry No. 25, Ex. 23).  In her deposition, Poehler testified that she advised Cavey on May 9 that firing Garcia before her investigation was complete "wouldn't be good timing."  (*Id.*, Ex. 30, Poehler Depo., at 88).  Poehler testified that Cavey was concerned that he had directed Garcia to take no action pending the investigation.  (*Id.*, at 96).

10

Cavey testified in his deposition that Garcia was fired for "performance issues." (Docket Entry No. 28, Ex. G, Cavey Depo., at 15). Cavey testified that those issues included management style, profitability, on-time deliveries, quality, and customer satisfaction. (*Id.*, at 49–50). Cavey testified that the level of customer satisfaction had not changed while Garcia was plant manager. (*Id.*, at 52). Cavey did not know if profitability at the Houston plant had improved during Garcia's tenure. Cavey claimed that he fired Garcia after receiving a recommendation to do so from Poehler. (*Id.*, at 43). Cavey also stated that the allegations of sexual harassment necessitating Poehler's investigation in Houston played "one of many" parts in his decision to termination Garcia. (*Id.*, at 71-72).

On February 13, 2009, Garcia filed this suit against MAC, Espinoza, and Solis. (Docket Entry No. 1, Ex. 2). In his complaint, Garcia alleges that MAC retaliated against him, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and the Texas Commission on Human Rights Act, Tex. Lab. Code § 21.055, by firing him for reporting sexual harassment directed toward Rincon and himself. Garcia alleges that Espinoza and Solis intentionally inflicted emotional distress by spreading rumors around the workplace that Garcia was homosexual. Garcia further alleges that these defendants libeled, slandered, and defamed him by communicating to other MAC employees and customers that Garcia was homosexual. Finally, Garcia alleges that Espinoza and Solis tortiously interfered with Garcia's contract with MAC by spreading false accusations about him, which led to Garcia's firing.

The defendants have moved for summary judgment on all of Garcia's claims. The arguments as to each claim are analyzed below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d

12

at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.    Analysis

### A.    The Retaliation Claims

Garcia claims that the defendants retaliated against him for reporting sexual harassment.  The defendants argue that Garcia cannot make a *prima facie* showing of retaliation because he did not engage in a protected activity.  Alternatively, the defendants argue that Garcia cannot show that "but for" his protected activity, he would not have been terminated.

Garcia alleges retaliation under both Title VII and the Texas Commission on Human Rights Act.  The same standard applies to both claims.  *See Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 530 (S.D. Tex. 1999), *aff'd,* 224 F.3d 765 (5th Cir. 2000) ("[T]he analysis of . . . claims under the TCHRA is identical to that applied to similar claims brought under Title VII.").  Title VII makes it an unlawful employment practice for an employer to "discriminate against any of his employees . . . because [the employee] has opposed [an unlawful employment practice] or . . . made a charge . . . under this subchapter."  42 U.S.C. § 2000e-3(a).  The elements of a *prima facie* showing of retaliation under Title VII are that the plaintiff: (1) engaged in an activity protected by Title VII; (2) was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action.  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).  If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate nonretaliatory reason for the adverse employment action.  *Id.*  If the defendant makes this showing, the burden shifts back to the plaintiff to show either: "(1) that the defendant's reason is not true, but is instead a pretext for [retaliation] (pretext alternative); or (2) that the

13

defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected [activity] (mixed-motive[s] alternative)."  *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (third alteration in original); *see also Smith v. Xerox Corp.*, 602 F.3d 320, 326 (5th Cir. 2010).   Under the pretext alternative, the plaintiff "bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose.  To carry this burden, the plaintiff must rebut each nondiscriminatory . . . reason articulated by the employer."  *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).   In other words, the plaintiff must demonstrate that the adverse employment action taken against him would not have occurred "but for" his protected conduct. *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *see also Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).  Under the mixed-motive alternative, if the plaintiff shows that the plaintiff's protected activity was a motivating factor, then the burden shifts to the defendant to show that the adverse employment decision would have been made even without consideration of the plaintiff's protected activity.  *See Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011); *Smith*, 602 F.3d at 326–27.

The first element of a *prima facie* case of retaliation is that the plaintiff engaged in an activity protected by Title VII.  "An employee has engaged in protected activity when she has (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998) (internal citations omitted).  The Supreme Court has held that the term "oppose," left undefined by the statute, carries its ordinary meaning, which includes "'to resist or antagonize; to contend against; to

14

confront; resist; withstand,'" or "'to be hostile or adverse to, as in opinion.'" *Crawford v. Metro.*

*Gov't of Nashville & Davidson Cnty.*, 129 S. Ct. 846, 850 (2009) (alteration and citations omitted).

> Applying this standard, the Court held that a plaintiff who did not *initiate* a complaint about sexual harassment nevertheless engaged in protected conduct under the opposition clause. *Id.* at 849. In response to questions posed to her during an internal investigation, the plaintiff described various instances of sexually harassing behavior by another employee. The Court held that plaintiff's responses to employer questioning could reasonably be seen as resistant or antagonistic to the sexually harassing treatment, "if for no other reason than the point . . . explained by an EEOC guideline: 'When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's opposition to the activity.'" *Id.* at 851 (quoting 2 EEOC Compliance Manual §§ 8-II-B(1),(2), p. 614:0003 (Mar. 2003)). The Court rejected the Sixth Circuit's view that the opposition clause required an employee to engage in "active, consistent 'opposing' activities" and to instigate or initiate a complaint. *Id.* at 851.

*Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46–47 (1st Cir. 2010).

The record supports an inference that Garcia "opposed" Espinoza's treatment of Rincon. The record indicates that MAC's investigation into alleged sexual harassment at the Houston plant began when Garcia called Cavey and Poehler in Kansas City on May 5, 2008. During the series of phone calls that day, Garcia told Cavey and Poehler about Rincon's complaints of unwanted touching and offensive personal comments by Espinoza. The defendants characterize Garcia's activity as merely relaying a complaint. But the record contains evidence showing that Garcia reported Rincon's allegations as one of several instances of Espinoza's inappropriate behavior and that Garcia communicated his view that Espinoza's behavior had been inappropriate. Disapproving descriptions of inappropriate behavior can be protected activity. *See Crawford*, 129 S. Ct. at 850–51

(holding that the plaintiff's disapproving description to a company human resources officer of a fellow employee's behavior was covered by Title VII's opposition clause).  Garcia has established a fact issue as to the first prong of the *prima facie* case.

The defendants do not dispute the second prong of the *prima facie* case. Garcia was clearly subjected to an adverse employment action when he was fired.

The third element of a *prima facie* case for retaliation is a causal link between the protected activity and the adverse employment action.  "[T]he 'causal link' required in prong three of the prima facie case for retaliation is not as stringent as the 'but for' standard."  *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001).  In *Evans*, the fact that only five days elapsed between the protected activity and the adverse employment action was sufficient to provide a "causal connection" that satisfied the third prong.  *Id.*  Garcia was fired four days after reporting the allegations of sexual harassment to MAC executives in Kansas City.  Garcia has raised a fact issue as to the third and final prong of the *prima facie* case.

In its motion for summary judgment, MAC has articulated a legitimate nondiscriminatory reason for Garcia's termination: Poehler's belief that Garcia was going to fire Espinoza, in direct contravention of Cavey's instruction that no action be taken against any employee at the Houston plant until Poehler completed her investigation.  In retaliation cases in which the defendant has proffered a legitimate reason for the decision to fire the plaintiff, the burden shifts to the plaintiff to show that "but for" the nonretaliatory purpose, his employment would not have been terminated. *Pineda*, 360 F.3d at 487.  "To satisfy this burden, the plaintiff must offer 'some evidence that permits the jury to infer that the proffered explanation was a pretext for discrimination.  The trier

of fact may not simply choose to disbelieve the employer's explanation in the absence of any evidence showing why it should do so.'" *Id.* (citation and alteration omitted).

The record supports an inference that MAC's proffered reason for firing Garcia was pretextual. According to Garcia, when Poehler called to tell him Cavey's decision to fire him, she said that she could not explain the reason. (Docket Entry No. 28, Ex. B, Garcia Depo., at 90). MAC argues that it fired Garcia because it thought Garcia would fire Espinoza, defying Cavey's direction. MAC points to Poehler's deposition testimony that she told Cavey during a phone conversation on May 8, 2008, that she thought Garcia was going to fire Espinoza. (Docket Entry No. 25, Ex. 30, Poehler Depo, at 88). According to Poehler, Cavey stated during this conversation that "he simply could not have that, he could not have [Garcia] taking that action in direct contradiction to what he had told him." (*Id.*). But Cavey, who made the decision to fire Garcia, testified that he could not recall Poehler telling him that Garcia was going to fire Espinoza. (Docket Entry No. 28, Ex. G, Cavey Depo., at 81). Cavey offered other reasons for firing Garcia, including Garcia's management style, the lack of improvement in the profitability of the Houston plant under his leadership, and the lack of improvement in customer satisfaction. (Docket Entry No. 25, Ex. 31, Cavey Depo., at 8; Docket Entry No. 28, Ex. G, Cavey Depo., at 52). Although MAC does not rely on the reasons Cavey offered at his deposition for firing Garcia, (*see* Docket Entry No. 25, at 17–18), the fact that he gave reasons different from those MAC does rely on supports the conclusion that there are disputed issues material to determining whether the proffered reasons were pretextual. And Cavey admitted that Garcia's allegations of sexual harassment, which required human resources personnel to travel to Houston to investigate, played "one of many" parts in his decision to terminate Garcia's employment. (Docket Entry No. 28, Ex. 7, Cavey Depo., at 71-72).

Cavey testified that the primary reason for firing Garcia was his management style.  (*Id.*, at 49).  The record supports an inference that Cavey's concerns about Garcia's management style resulted at least in part from his complaints about the alleged sexual harassment of Rincon and the spreading of rumors that Garcia was homosexual.  Cavey testified that he sent Poehler to Houston after Garcia's sexual-harassment allegations to "attempt to stabilize the personnel chaos."  (*Id.*, at 38).  When asked to explain what he meant by "personnel chaos," Cavey stated "[j]ust wild accusations, not contributing to the value of the company."  (*Id.*).  As Cavey explained, Poehler was investigating "[t]he chaos, the lack of management control, the disruption by the individual and how it was impacting the organization."  (*Id.*, at 43).  Cavey testified that he felt Garcia "was too highly emotional to be a plant manager," and that "the most concerning issue" was Garcia's "[m]anagement style," which was "totally out of control creating chaos in the organization."  (*Id.*, at 49).  Cavey testified that Garcia's inability to prevent his employees from circulating jokes about his sexual orientation "was evidence that things were out of control."  (*Id.*, at 71).  Viewed in the light most favorable to Garcia, the record supports the inference that Cavey's primary reason for firing Garcia—Garcia's management style—was related to Garcia's complaints of sexual harassment directed at both himself and Rincon.

Cavey offered the lack of improvement in plant profitability as another reason for firing Garcia.  But Garcia testified that the Houston plant was earning $465,000 per month when he got there and that under his leadership, it earned $1.3 million during the first month, $1.1 million during the second month, and over $1.0 million during the third month.  (Docket Entry No. 28, Ex. B, Garcia Depo., at 90).  Garcia also testified that he received compliments from employees in MAC's corporate office because he improved profitability.  (*Id.*)  When asked whether he had any reason

to disagree with Garcia's statements about the profitability of the Houston plant during his first three months as plant manager, Cavey replied that he could not verify Garcia's facts.  (Docket Entry No. 25, Ex. 31, Cavey Depo., at 34).  Cavey later testified that although he did not know whether Garcia improved profitability at the Houston plant and did not know "the specifics," he nonetheless believed that the plant was underperforming.  (Docket Entry No. 28, Ex. G, Cavey Depo., at 46–47).  Viewed in the light most favorable to Garcia, the record supports an inference that the lack of improvement in the Houston plant's profitability was a pretextual reason for firing Garcia.[5]

Cavey also testified that the lack of improvement in customer satisfaction played a role in his decision to fire Garcia.  But Cavey admitted that the level of customer satisfaction either remained unchanged under Garcia's leadership or may have improved.  (*Id.*, at 52).  As with the level of profitability, Cavey claimed that Garcia did not meet MAC's expectations in improving customer satisfaction.  (*Id.*).  This performance criticism was, however, both general and conclusory.  Taking the disputed facts in the light most favorable to Garcia, this court finds that a reasonable jury could infer that customer satisfaction was a pretextual reason for firing Garcia.

Garcia's pretext evidence may not be compelling, but that is not the standard.  To survive summary judgment, Garcia "must offer some evidence that permits the jury to infer that [MAC's] proffered explanation [for firing him] was a pretext for discrimination."  *Pineda*, 360 F.3d at 487 (internal quotation marks omitted).  Garcia has met his burden.  In its motion for summary judgment, MAC argued that it fired Garcia because Poehler believed that Garcia was going to fire Espinoza

---

[5]  MAC's profitability chart submitted along with its motion for summary judgment (Docket Entry No. 25, Ex. 29) does not change the result.  The chart confirms Garcia's numbers for the first three months of Garcia's employment.  Though the chart shows that the Houston plant's revenue declined and never exceeded one million dollars after Garcia's third month there, the revenue was always above $465,000, which Garcia testified was the plant's monthly revenue when he arrived.

in contravention of Cavey's direction.  But the record shows that Cavey, who made the decision to fire Garcia, did not recall Poehler telling him that Garcia was going to fire Espinoza.  Cavey offered other reasons for Garcia's termination.  As discussed above, the record supports the inference that Cavey's primary reason for firing Garcia—Garcia's management style—was related to Garcia's sexual-harassment allegations.  Cavey also admitted that Garcia's sexual-harassment allegations played a role in his decision to fire Garcia.  Cavey's testimony that Garcia's complaints of sexual harassment played a role in the decision to terminate Garcia's employment; Garcia's testimony that Poehler refused to tell him why Cavey decided to terminate his employment; and the fact that Garcia was fired only four days after he complained about sexual harassment, raise a fact issue material to determining what role the protected conduct played in the decision to fire him.  Because there is a disputed fact issue material to determining whether Garcia would have been fired but for his protected conduct, the defendants are not entitled to summary judgment on this claim.

Even assuming, without deciding, that Garcia failed to raise a fact issue as to whether MAC's proffered reason for terminating his employment was a pretext for retaliation, the defendants are still not entitled to summary judgment.  Garcia argues not only that he met his burden at step three of the traditional *McDonnell Douglas* framework, but also under the mixed-motive approach.  (Docket Entry No. 28, at 17).  Under that approach, Garcia does not have to show that MAC would not have terminated him "but for" his protected conduct.  In his deposition, Cavey testified that Garcia's reporting that Espinoza was sexually harassing Rincon and that Espinoza and Solis were spreading rumors that Garcia was homosexual played a role in his decision to terminate Garcia.  (Docket Entry No. 28, Ex. G, Cavey Depo., at 71–72).  Because Garcia points to evidence that his protected activity was a motivating factor in Cavey's decision to fire him, under the mixed-motive framework,

20

the burden shifts to MAC to show that it would have terminated Garcia's employment without considering his protected conduct.

Not only does MAC fail to address its burden under the mixed-motive framework, but the record evidence gives rise to a disputed fact issue material to determining whether MAC would have terminated Garcia had he not complained of the sexual harassment of Rincon and of himself. As discussed above, Cavey testified that his primary reason for firing Garcia was Garcia's management style, which created "chaos" at the Houston plant. Cavey admitted that Garcia's sexual-harassment complaints were evidence that Garcia could not exercise control over the employees at the Houston plant. On this record, MAC has not sustained its burden of showing that Cavey would have fired Garcia even without considering his complaints of sexual harassment and the allegations that Espinoza and Solis were spreading rumors and jokes that he was homosexual. Legitimate pre-existing concerns about Garcia's performance notwithstanding, the record supports the inference that Garcia's sexual harassment allegations precipitated Garcia's termination and that MAC would not have fired Garcia had he not made his complaint. MAC is not entitled to summary judgment on the retaliation claim under either the *McDonnell Douglas* or mixed-motive frameworks.

### B.    The Tortious Interference Claim

The elements of a claim for tortious interference with existing contractual relations are (1) the existence of a contract subject to interference, (2) a willful and intentional act of interference, (3) that was the proximate cause of the plaintiff's damages, and (4) that resulted in actual damage or loss. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996). In his complaint, Garcia alleged that Espinoza and Solis tortiously interfered with his employment contract with MAC "by defaming and spreading false accusations regarding [Garcia] in an attempt to cause

21

. . . MAC to end [Garcia's] contract." (Docket Entry No. 1, Ex. 2, at 7). The defendants move for summary judgment on the tortious interference claim based, in part, on the absence of any causal nexus between the jokes and rumors Espinoza and Solis allegedly told about Garcia's sexual orientation and the decision Cavey made to fire him. Garcia did not respond to this argument.

The evidence does not support Garcia's allegation that Espinoza's and Solis's jokes and rumors about Garcia's sexual orientation were a proximate cause of the decision Cavey made to fire him. To the contrary, Garcia's own position is that it was retaliation for his complaints about the conduct, not the conduct itself, that led to his firing. There is no evidence in the record that Cavey fired Garcia because he believed Epinoza's and Solis's jokes and rumors that Garcia was homsexual. Garcia's own testimony undermines his claim. When asked "what it is that . . . Espinoza did personally himself to cause the company to fire you," Garcia responded "I don't know." (Docket Entry No. 25, Ex. 33, Garcia Depo., at 107). When asked "what did Arturo Solis do to get you fired," Garcia replied "I don't know." (Docket Entry No. 28, Ex. B, Garcia Depo., at 105). The defendants are entitled to summary judgment on this claim.

### C.    The Defamation Claims

The elements of defamation are that: (1) the defendant published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with malice, if the plaintiff was a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). A defamatory statement is one in which the words tend to damage a person's reputation, exposing him or her to public hatred, contempt, ridicule, or financial injury. *Einhorn v. LaChance*, 823 S.W.2d 405, 410–11 (Tex. App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.).

A court considering a defamation action must determine if the words used were reasonably "capable of a defamatory meaning." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 155 (Tex. 2004); *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 654–55 (Tex. 1987) (citations omitted); *Gumpert v. ABF Freight Sys.*, 293 S.W.3d 256, 264 (Tex. App.—Dallas 2009, pet. denied). Courts must initially consider "the statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement." *Musser*, 723 S.W.2d at 655. This hypothetical listener "exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications." *Isaacks*, 146 S.W.3d at 157.

"An assertion may be defamatory *per se*, while another may be found as a matter of law to be incapable of defamatory meaning under an objective standard of reason." *Robinson v. Radio One, Inc.*, 695 F. Supp. 2d 425, 428 (N.D. Tex. 2007) (internal citation omitted). "[I]f neither is true, then the assertion 'is ambiguous or of doubtful import' and must be submitted to a jury to determine its meaning and what effect it would have heard by persons of ordinary intelligence." *Id.* (citing *Turner v. KTRK TV., Inc*., 38 S.W.3d 103, 114 (Tex. 2000)). As the Texas Supreme Court has noted, "[t]his is not the same as asking whether all readers actually understood the satire, or 'got the joke.' Intelligent, well-read people act unreasonably from time to time, whereas the hypothetical reasonable reader, for purposes of defamation law, does not. In a case of parody or satire, courts must analyze the words at issue with detachment and dispassion, considering them in context and as a whole, as the reasonable reader would consider them." *Isaacks*, 146 S.W.3d at 158.

In Texas, the imputation of homosexuality was historically defamatory *per se* because it was tantamount to sodomy, which was then criminal. *Plumley v. Landmark Chevrolet, Inc.,* 122 F.3d 308, 311 (5th Cir. 1997). False imputation of criminal behavior is *per se* defamatory. *Leyendecker*

& *Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984); *Christy v. Stauffer Publ'ns, Inc.*, 437 S.W.2d 814, 815 (Tex. 1969).  But the Texas cases have not addressed whether an imputation of homosexuality continued to be defamatory as a matter of law after the United States Supreme Court overturned the Texas sodomy statute in *Lawrence v. Texas*, 539 U.S. 558 (2003).  Several courts have held that a false statement that an individual is homosexual is not defamatory *per se* after *Lawrence*.  *See, e.g., Stern v. Cosby*, 645 F. Supp. 2d 258, 275 (S.D.N.Y. 2009) (holding that although statements imputing homosexuality are "susceptible to a defamatory meaning," they are not defamatory *per se* under New York law); *Albright v. Morton*, 321 F. Supp. 2d 130, 138 (D. Mass. 2004) ("If this Court were to agree that calling someone a homosexual is defamatory per se—it would, in effect, validate that sentiment and legitimize relegating homosexuals to second-class status."); *see also* Patricia C. Kussmann, *Imputation of Homosexuality as Defamation*, 7 A.L.R.6th 135 (2005) (stating that "[c]ourts are divided as to whether a false imputation of homosexuality is defamatory per se" and collecting cases for each position); Eric K.M. Yatar, *Defamation, Privacy, and the Changing Social Status of Homosexuality: Re-Thinking Supreme Court Gay Rights Jurisprudence*, 12 LAW & SEX. 119, 129–30 (2003) ("Determining whether a false imputation of homosexuality is defamatory, such that it would harm an individual's reputation, is a somewhat complicated endeavor given the changing social status of homosexuals in modern American society.").  At least one court has gone even further and held that a statement imputing homosexuality can never be defamatory.  *See Murphy v. Millennium Radio Grp. LLC*, No. 08-1743 (JAP), 2010 WL 1372408, at *7 (D. N.J. March 31, 2010) (holding that "the assertion that someone is homosexual is not defamatory" under New Jersey law), *vacated on other grounds*, 2011 WL 2315128 (3d Cir. 2011).  Because neither party has addressed whether a statement that someone is

homosexual is defamatory *per se* under Texas law after *Lawrence*, this court will not address this issue at this stage of the litigation.

The only argument the defendants make in support of their summary judgment motion on Garcia's defamation claim is that because Espinoza was joking about Garcia being homosexual, his statements could not be understood to describe actual facts. To determine whether Espinoza's statements "are capable of a defamatory meaning, [the court] must examine the circumstances under which the [statements] were made and decide whether they could reasonably be understood as describing actual facts" about Garcia. *Gumpert*, 293 S.W.3d at 264. "A parody or spoof that no reasonable person would read as a factual statement, or as anything other than a joke—albeit a bad joke—cannot be actionable as defamation." *Walko v. Kean Coll. of N.J.*, 561 A.2d 680, 683 (N.J. Super. Ct. Law Div. 1988). But "[a] defendant cannot escape liability for defamatory factual assertions simply by claiming that the statements were a form of ridicule, humor or sarcasm." *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 209 (Ill. 1992). "[A]s stated by an Irish court, 'The principle is clear that a person shall not be allowed to murder another's reputation in jest' and that 'if a man in jest conveys a serious imputation, he jests at his peril.'" *Polygram Records, Inc. v. Superior Court*, 216 Cal. Rptr. 252, 258 n.11 (Cal. Ct. App. 1985) (citation and alteration omitted). "The proper focus of judicial inquiry . . . is not whether the allegedly defamatory statement succeeds as comedy, nor whether its audience thought it to be humorous or believed it to be true; the threshold inquiry is simply whether the communication in question could reasonably be understood in a defamatory sense by those who received it." *Id.* at 259.

Rincon testified not only that Espinoza was joking about Garcia being homosexual, but also that Solis and Espinoza "were talking about [Garcia] being gay," (Docket Entry No. 28, Ex. C,

Rincon Depo., at 86), that Espinoza stated he thought Garcia was homosexual, (*id.*, at 94–95), and that Espinoza played a video with two homosexual men and stated that Garcia "was one of the gays in the video," (*id.*, at 95). Rincon also testified that Solis told her that he admitted to Garcia after Garcia confronted him that Solis and Espinoza had been "calling [Garcia] gay." (*Id.*, at 86). Garcia testified that Solis told him that Espinoza was spreading rumors around the plant that Garcia was homosexual. (*Id.*, Ex. B, Garcia Depo., at 112). Solis testified that there was general talk around the plant about Garcia being homosexual. (Docket Entry No. 25, Ex. 32, Solis Depo., at 16). On this record, the court cannot conclude as a matter of law that Espinoza's statements could not be understood as reasonably conveying actual facts. "Whether the remarks were actually understood as harmless jokes or as defamatory statements is for the trier of fact to determine." *Kolegas*, 607 N.E.2d at 209. The defendants are not entitled to summary judgment on this claim.

### D.      The Intentional Infliction of Emotional Distress Claim

To prevail on an intentional infliction of emotional distress claim under Texas law, the plaintiff must prove that: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). Liability under this cause of action "shall be found 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d. (1965)); *see also Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993). The cause of action does not arise based on mere insults, indignities, or threats. *Johnson v. Merrell Dow Pharm., Inc.*, 965 F.2d 31, 33 (5th Cir. 1992).

"[T]he intentional infliction of emotional distress [is], first and foremost, a 'gap-filler' tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). "The tort's 'clear purpose' . . . [is] 'to supplement existing forms of recovery by providing a cause of action for egregious conduct' that might otherwise go unremedied." *Id.* (citing *Standard Fruit and Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998)). A claim for intentional infliction of emotional distress should be independent of other claims. *Swafford v. Bank of Am. Corp.*, 401 F. Supp. 2d 761, 764 (S.D. Tex. 2005). "Even if other remedies do not explicitly preempt the tort, their availability leaves no gap to fill." *Creditwatch, Inc. v. Jackson,* 157 S.W.3d 814, 816 (Tex. 2005). When the facts underlying the plaintiff's intentional infliction of emotional distress claim are already covered by another common law tort, the plaintiff may not recover for intentional infliction of emotional distress because the latter tort "was never intended as an easier and broader way to pursue claims already protected by [Texas's] expanding civil . . . laws." *Id.* at 818.

Garcia alleged that Espinoza and Solis are liable for intentional infliction of emotional distress because they spread rumors and jokes that Garcia was homosexual. Garcia alleged that the defendants are liable for defamation because they "communicated and published in oral and written form to other employees . . . and to customers . . . that [Garcia] was a homosexual," when in fact he was not. (Docket Entry No. 1, Ex. 2, at 6). Because the facts underlying Garcia's intentional infliction of emotional distress claim are the same facts supporting his defamation claim—in addition to his Title VII and TCHRA claims—the intentional infliction of emotional distress claim

27

fails.  *See Priebe v. A'Hearn*, No. 01–09–00129–CV, 2011 WL 1330808, at *5 (Tex. App.—Houston [1st Dist.] Apr. 6, 2011, no pet.) ("To the extent that the facts underlying [the plaintiff's] defamation claim also supported her intentional infliction of emotional distress claim, her recovery was barred and the JNOV was properly granted."); *Draker v. Schreiber*, 271 S.W.3d 318, 323 (Tex. App.—San Antonio 2008, no pet.) (rejecting the plaintiff's argument that "intentional infliction of emotional distress should be available as a 'gap filler' when . . . [the plaintiff] has been precluded from asserting a defamation claim 'as a matter of law'" and stating that "[i]f the gravamen of [the plaintiff's] complaint was defamation, it matters not whether she succeeded on, or even made, such a claim"); *Oliphint v. Richards*, 167 S.W.3d 513, 517 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("Because [the plaintiff] did not even attempt to base his intentional infliction of emotional distress claim on facts independent of his defamation claim, we hold that an intentional infliction of emotional distress claim is not available.").

Moreover, the record does not reveal that the defendants' actions were sufficiently outrageous to constitute intentional infliction of emotional distress.  "It is for the court to determine in the first instance whether conduct is extreme and outrageous, and such claims are submitted to a jury only when reasonable minds may differ."  *Creditwatch*, 157 S.W.3d at 817.  Assuming for the purpose of this motion that Garcia's allegations are true, the defendants' conduct may have been "callous, meddlesome, mean-spirited, officious, overbearing, and vindictive," but was not "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Id.* at 817–18 (citation omitted).  "Meritorious claims for intentional infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly

characterized as extreme and outrageous." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006). "[E]xcept in circumstances bordering on serious criminal acts, [heinous] acts will rarely have merit as intentional infliction claims." *Creditwatch*, 157 S.W.3d at 818. The defendants' alleged conduct, though reprehensible, does not rise to this high standard. The defendants are entitled to summary judgment on this claim.

## IV.   Conclusion

The defendants' motion for summary judgment on Garcia's retaliation and defamation claims is denied. The defendants' motion for summary judgment on Garcia's intentional infliction of emotional distress and tortious interference claims is granted. A status conference is set for **September 22, 2011**, at 3:30 p.m.

SIGNED on September 15, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

29